UNITED STATES of America, Appellee,

v.

Jose Cristobal FERMIN CASTILLO,
Defendant, Appellant.

No. 86–1973.

United States Court of Appeals,
First Circuit.

Heard July 31, 1987.

Decided Sept. 25, 1987.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

The appellant, Jose Cristobal Fermin Castillo (Fermin), protests his conviction in the United States District Court for the District of Puerto Rico for wire fraud. We affirm.

## I

Fermin's troubles flowed from a scheme to defraud Granja Mora, C.por A. (GM), a poultry breeder based in the Dominican Republic. At a time when chickens were dying there in great numbers due to a shortage of provender, Fermin sprang to the (supposed) rescue. Holding himself out as the president of Shipping and Trading Tradeship Company (Shattco), he offered to sell GM fowl fodder (1050 metric tons of corn) at a price which was, assuredly, not chicken feed. Cost notwithstanding, the breeder was enthusiastic: the flock faced starvation without the corn.

On April 12, 1984, Fermin sent a telex to GM restating the offer and requesting payment by either telex or letter of credit (L/C). GM confirmed the purchase by next-day telex, indicating that Banco Popular Dominicano (BancoDom) had authorized an L/C. This message mentioned that Fermin would have to submit several documents to GM or its bankers: a bill of lading, a commercial invoice, a certificate of origin, and a phytosanitary certificate.[1] BancoDom's correspondent financial institution, Banco Popular de Puerto Rico (BancoPR), was to handle actual delivery of the funds in Puerto Rico (where Shattco was headquartered). BancoDom promptly telexed its correspondent, instructing that negotiation of the L/C (*i.e.*, effectuation of payment pursuant to its terms) was dependent on presentation of these four documents in proper form.

The next communication occurred on April 16 when BancoDom, not suspecting foul play, informed Fermin that an L/C for $181,650 had been established at BancoPR. In the interim, appellant presented to Ban-

Rafael F. Castro Lang, San Juan, P.R., for defendant, appellant.

Lydia Lizarribar, Asst. U.S. Atty., Old San Juan, P.R., with whom Daniel F. Lopez Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

---

1. Phytosanitary certification was needed to demonstrate that the shipped corn was disease-free.

coPR papers which purported to be the authenticating documents needed under the L/C. Noting some divergence between the proffer and the credit requirements, the Puerto Rican bank sent a telex to Banco-Dom on April 18, informing the latter about the discrepancies and asking for directions. BancoDom swallowed the ersatz feed; it telexed back the following day, authorizing payment despite the quirks in the paperwork. The appellant received $180,525.56, which he deposited to his account at an entirely different bank. Despite the nonappearance of the maize, he kept the money.

In all, six telexes were sent between the time appellant initiated the scheme and the time he collected the funds. The corn, it would seem, never existed; certainly, it was never shipped as promised, nor was it ever delivered to GM. The chickens, however, came home to roost. Fermin was indicted and charged with six counts of wire fraud in violation of 18 U.S.C. §§ 2, 1343 (1982).[2] Following his jury trial and across-the-board conviction, the district court imposed six separate two year sentences, to be served consecutively, and ordered the defendant to make restitution of the funds which he had filched from GM. Fermin—having both given less and gotten more than he had bargained for—lost little time in filing this appeal.

## II

The appellant essays a pair of challenges to the merits of his conviction. We evaluate these kernels one by one.

**2.** These statutes provide:
　(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
　(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
18 U.S.C. § 2 (1982).
　Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such

A. *Variance.* Fermin asserts that there was a variance between the allegations of the indictment and the government's proof at trial. Paragraph F of the preamble to the indictment, later incorporated by reference in each of the charging counts, stated that on April 17, 1984, the four enumerated purchase documents (*i.e.*, the bill of lading, invoice, certificate of origin, and phytosanitary certificate) "were required by [BancoPR] before the issuance of a letter of credit." The appellant argues that the proven facts varied from the indictment in two essential particulars: (1) the L/C was issued by BancoDom, not BancoPR; and (2) the purchase documents were presented to obtain payment under BancoDom's *existing* L/C, not to procure the future issuance of one from BancoPR. Conceding Fermin's account of the government's proof to be essentially accurate,[3] his assignment of error is nonetheless unavailing.

 Technically, a variance occurs every time that the government, at trial, proves facts different from those alleged in the indictment. Yet, not every infelicitously chosen word or inept description of events leaves the prosecution high and dry. Only material variances warrant reversal of a conviction—departures which adversely affect a defendant's substantial rights. *United States v. George*, 752 F.2d 749, 753–54 (1st Cir.1985); *United States v. Flaherty*, 668 F.2d 566, 582 (1st Cir.1981).

scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
18 U.S.C. § 1343 (1982).

**3.** The government argues, not without persuasive force, that BancoPR and BancoDom were, for purposes of this L/C transaction, one and the same financial institution. This construction is based largely upon the trial testimony of two officials of BancoPR. We decline to undertake the exacting fact/law analysis which this suggestion entails. It is beyond cavil that, if and to the extent the proof diverged from the indictment, no substantial right of the defendant's was affected thereby. *See* text *infra.* Thus, we assume for argument's sake that, as Fermin contends, a variance did exist.

When the difference deprives an accused of sufficiently specific information to prepare a defense, unfairly surprises him at trial, or isolates him from the constitutional protection against double jeopardy, he has a legitimate complaint. *See George,* 752 F.2d at 754; *Flaherty,* 668 F.2d at 582.

Measured by this yardstick, the presumed variance between the proof and the indictment in this case cannot warrant upsetting the appellant's conviction. We subscribe to the view that a court should examine an indictment "as a whole and should refrain from reading it in a hypertechnical manner." *United States v. Gironda,* 758 F.2d 1201, 1209 (7th Cir.) (citation omitted), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985). Perused in this fashion, the instant indictment weathers the storm. First and foremost, the bill apprised Fermin in meticulous detail of the charges against him. By no stretch of the imagination was the defendant deprived of the specific information he needed to prepare his defense. Early on, he enjoyed "open file" pretrial discovery. *Inter alia,* the government divulged the existence of the L/C and proffered it for examination. The appellant knew to a certainty that this was the L/C upon which the prosecution relied. No other L/C was ever mentioned. There was no cognizable risk of confusion or of a journey down the primrose path. In this case, singularity was the keynote: there was only the one transaction, only the one apocryphal shipment of corn, only the one letter of credit, only the one swindled payment.

Nor was the trial a surprise party in any sense. Fermin understood full well what was coming. He was not caught napping by the details surrounding the issuance of the L/C. Indeed, his counsel conceded during oral argument that there had been no surprises at trial. Moreover, no legitimate double jeopardy concerns hover in the wings. If need be, the record from Fermin's trial, including the L/C itself, can be introduced in any subsequent prosecution in support of a double jeopardy defense. *See George,* 752 F.2d at 754. Perhaps most telling, the statements in the indictment to which Fermin alludes reflect only peripheral adjuncts of his criminality. The indictment did not allege a scheme to obtain an L/C. Rather, it charged—in stark and unambiguous terms—a plot through which Fermin, employing telexes, defrauded GM out of substantial funds. And, the United States proved this very scheme with considerable precision at trial. All of these considerations counsel rejection of the appellant's grievance.

Although the government must be held to high standards of fairness, propriety, and exactitude when it undertakes to indict and prosecute, a criminal trial cannot be allowed to deteriorate into a recondite game of trivial pursuit. We conclude that the appellant has failed to show that any of his substantial rights were threatened by a material variance between the charges and the proof at trial. Accordingly, we find no plausible ground to disturb Fermin's conviction on this score.

B. *The Telexes.* The appellant's second asseveration stems from the idea that four of the six counts laid against him (Counts II, III, V, and VI) should be dismissed because the telexes upon which those counts relied were not sent for the purpose of executing the fraudulent scheme.[4] Although he does not explicitly raise causation as an issue, his exposition seems to attach considerable weight to the fact that he was not the immediate moving force in the decision to send these telexes. As Fermin repeatedly observes, these four messages, without exception, were initiated by

---

**4.** Each count of the indictment centered around a distinct telex. For ease in reference, the bill can be parsed as follows:

1. Count I—telex sent by Fermin to GM outlining purchase proposal (4/12/84)
2. Count II—telex sent by BancoDom to BancoPR re authorization of L/C (4/13/84)
3. Count III—telex sent by GM to Fermin accepting purchase proposal (4/13/84)

4. Count IV—telex sent by BancoDom to Shattco confirming approval of L/C arrangement (4/16/84)
5. Count V—telex sent by BancoPR to BancoDom re documentary discrepancies (4/18/84)
6. Count VI—telex sent by BancoDom to BancoPR directing payment under L/C (4/19/84)

one or the other of the banks and comprised little more than inter-bank communications anent the L/C. Inasmuch as innocent third parties (*i.e.*, the banks) not in league with Fermin sent and received these telexes, appellant portrays the transmissions as frosting, not cake. Because they were not integral to the plot, Fermin's thesis runs, the counts predicated upon them were legally insufficient. We disagree with this Leibnitzian view of the law and the facts.

■ Some background is helpful. The language of the (newer) wire fraud statute, 18 U.S.C. § 1343, tracks that of the (older) mail fraud statute, 18 U.S.C. § 1341. The requisite elements of the crimes, apart from the means employed, are identical. The legislative history of the wire fraud statute reveals that it was patterned on the mail fraud law. *See* S.Rep. No. 44, 82d Cong., 1st Sess. 19 (1951) (§ 1343 was designed as "a parallel [to the] provision now in the law for fraud by mail"). We think the statutes can fairly be regarded as being in *pari passu.* Accordingly, we hold that, in general, caselaw construing § 1341 is instructive for purposes of § 1343. In so holding, we align ourselves with several of our sister circuits. *See United States v. Lemire,* 720 F.2d 1327, 1334–35 n. 6 (D.C. Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984); *United States v. Feldman,* 711 F.2d 758, 763 n. 1 (7th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983); *United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1188 n. 14 (4th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *United States v. Tarnapol,* 561 F.2d 466, 475 (3d Cir.1977). We note that this holding makes explicit the fair implication of our own earlier cases. *See, e.g., United States v. Benmuhar,* 658 F.2d 14, 16–17 (1st Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2927, 73 L.Ed.2d 1328 (1982) (identical legal principles applied to wire and mail fraud counts, without discussion of theoretical underpinnings).

■ In *Benmuhar,* 658 F.2d at 16–17, we held that a defendant's failure personally to telegraph, mail, or telephone information made no difference where use of the mails or wires by third parties "would foreseeably follow in the ordinary course of business." *Accord United States v. Draiman,* 784 F.2d 248, 251 (7th Cir.1986) ("mailings between innocent parties may satisfy the statute [18 U.S.C. § 1341] if the scheme has not reached fruition"). As long as some use of the instrumentality in the course of the endeavor was reasonably to be anticipated, the causation requirement is met. *United States v. Silvano,* 812 F.2d 754, 760 (1st Cir.1987) (the use must be "reasonably foreseeable as a result of the defendant's actions"); *United States v. Contenti,* 735 F.2d 628, 631 (1st Cir.1984) (accused guilty if act done "with knowledge that the use ... will follow in the ordinary course of business, or where [accused] could reasonably foresee that use ... would result"). *See Peireira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954) (a scheme need not envision the mails as an essential element of the criminal plan, so long as "such use can reasonably be foreseen, even though not actually intended"); *United States v. Gonzalez-Sanchez,* 825 F.2d 572, 588 & n. 54 (1st Cir.1987) (similar). Here, all the transmissions occurred before the plot reached its lucrative climax. The mere fact that third parties—apart from Fermin and his prey—sent and received all of them is of scant consequence, given the predictable complexities of international finance.

We need elaborate on the point but briefly. It is reasonably foreseeable that, in the ordinary course of time-critical business between a correspondent bank and a foreign bank seeking the formulation of an L/C, telexes will have to be sent. Having been the architect of an artifice which reached across national borders, it was foreseeable —indeed, likely—that an L/C would be employed as the means of payment.[5] Whether or not the appellant had foreknowledge of the precise series of telexes which would

---

5. Lest we forget, Fermin's original proposition to GM stipulated that payment for the (imagi-

nary) corn be effectuated by telex or letter of credit.

be necessary to spring the trap is beside the point. What is more pertinent is the abundance of evidence from which the requisite foreseeability could be discerned. On this record, there was ample room for the jury to conclude beyond any doubt that Fermin "caused" those telexes to be transmitted within the purview of 18 U.S.C. § 1343. *Compare Gonzalez-Sanchez,* 825 F.2d at 588 & n. 54.

■ It is not enough, however, that the challenged use of the mails or wires was reasonably foreseeable. The communications must also have been more than peripheric; they must have touched one or more of the core transactions of the plot. The needed degree of integration defies formulaic quantification. Each case must be judged on its own facts to ascertain whether the predicate message was "closely related to the scheme." *Silvano,* 812 F.2d at 760. *See also United States v. Maze,* 414 U.S. 395, 399–400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974) (although scheme need not contemplate use of mails as essential element, communiques must be "sufficiently closely related" to criminal design to bring conduct within the statutory prohibition); *United States v. Forzese,* 756 F.2d 217, 220–21 (1st Cir.1985); *United States v. Rendini,* 738 F.2d 530, 533–34 (1st Cir.1984); *United States v. McNeill,* 728 F.2d 5, 14–15 (1st Cir.1984).

■ The case at bar does not call upon us to locate the exact point at which the relationship between communication and scheme becomes too attenuated to support conviction. Under virtually any rule of reason, it must be found that the telexes in question in this case were tied tightly to the plot and were solidly integrated into its felonious structure. Indeed, these telexes—or communications like them—were essential to the success of appellant's plan. If any one of them had not been sent, Fermin would not have received his ill-gotten gains. Because the telexes were "a normal concomitant of a transaction that [was] essential to the fraudulent scheme," *Contenti,* 735 F.2d at 631 n. 2 (quoting *United States v. Lea,* 618 F.2d 426, 430 (7th Cir.), *cert. denied,* 449 U.S. 823, 101

S.Ct. 82, 66 L.Ed.2d 25 (1980)), the required nexus unquestionably existed. Each of them comprised a sufficiently integral part of the criminal design to support the weight of a count in the indictment. Since each such use of the wires pursuant to a criminal fraud constituted a separate, independent, freestanding crime, *United States v. Calvert,* 523 F.2d 895, 903 n. 6 (8th Cir.1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976), we see no reason to derange Fermin's conviction on any of the counts.

### III

The remaining issues raised by appellant touch upon his sentencing. We separate them into two categories.

■ A. *Consecutive Sentences.* Fermin, without meaningful citation of pertinent authority, asserts his belief that the district court erred in meting out six consecutive two year sentences. This plaint emphasizes what appellant sees as the singularity of the prosecution's case: there was, in his view, but a single scheme to defraud, a single criminal intent, a single victim, and a single payment. So, he argues, he was subjected to multiple punishments for what amounted to a unitary— and solitary—offense. Though not without some superficial appeal, this contention is fundamentally flawed.

It is well established that each use of the wires constitutes a separate crime under 18 U.S.C. § 1343, even if the several uses are in pursuance of but one criminal enterprise. *Benmuhar,* 658 F.2d at 21; *Calvert,* 523 F.2d at 914; *Henderson v. United States,* 425 F.2d 134, 138 n. 4 (5th Cir.1970). Separate crimes, of course, can support independent sentences. Nothing in the law prohibits consecutive sentences for multiple violations of § 1343 which arise out of a single scheme and course of conduct. And, it is settled that there is no error in imposing consecutive sentences for multiple violations of the wire fraud statute. *See United States v. Moss,* 631 F.2d 105, 106 n. 3 (8th Cir.1980) (per curiam) (*inter alia,* nine two year sentences for convictions on nine

counts of wire fraud to be served consecutively); *United States v. Bohr*, 581 F.2d 1294, 1304 (8th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978) (two consecutive four year sentences for two counts of wire fraud); *Calvert*, 523 F.2d at 914 (aggregate forty-five year sentence imposed for convictions on twelve counts of mail and wire fraud); *Lindsey v. United States*, 332 F.2d 688, 692–93 (9th Cir.1964) (six consecutive five year sentences on six counts of wire fraud).

Congress has set the punishment for each violation of the statute at a maximum of five years. 18 U.S.C. § 1343. The appellant, having been convicted of six counts under the statute, was exposed to imprisonment for up to thirty years. There is nothing in the Constitution or in the legislative history or language of § 1343 which forbade the imposition of a sentence of that magnitude in the circumstances of this case. *See generally Missouri v. Hunter*, 459 U.S. 359, 365–69, 103 S.Ct. 673, 677–79, 74 L.Ed.2d 535 (1983); *Albernaz v. United States*, 450 U.S. 333, 339–44, 101 S.Ct. 1137, 1142–45, 67 L.Ed.2d 275 (1981); *United States v. Ouimette*, 753 F.2d 188, 193 (1st Cir.1985). Because each separate crime pivoted off a different (and distinctive) wire transmission, *see supra* n. 4, each "require[d] proof of a fact which the other[s] [did] not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932) (quoting *Gavieres v. United States*, 220 U.S. 338, 342, 31 S.Ct. 421, 422, 55 L.Ed. 489 (1911)). Accordingly, the aggregate twelve year sentence Fermin received was well within the statutory maximum. Any contention which he may make to the contrary is the sort of purely philosophical argument which is better addressed to Congress than to the courts.

■ The appellant also asserts that his sentence is so onerous as to constitute cruel and unusual punishment in violation of the eighth amendment to the federal Constitution. Yet, "[t]he trial judge has broad discretion in making sentencing decisions, and we will not overturn that decision absent an abuse of discretion or extraordinary circumstances...." *United States v.*

*Samalot Perez*, 767 F.2d 1, 5–6 (1st Cir. 1985) (citations omitted). Given the details of the several offenses and the characteristics of the offender, Fermin's sentence does not seem unjust—nor even particularly severe. Whether this court would have fashioned an identical sentence is wholly irrelevant. What is dispositive of the point is that the sanction imposed fully comported with the pertinent constitutional norms. *See generally Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

■ B. *Restitution.* As a special condition of probation, the district court ordered the defendant to make restitution to GM for the full amount of its loss ($180,-525.26). Fermin points out, however, that the poultry farm has instituted a civil suit for reimbursement against him and his wife. He contends that his sentence should be modified to provide for reduction of the restitutory obligation by any sums recovered in the civil action, *pro tanto*. Elsewise, GM stands to gain a trouvaille, *i.e.*, a double recovery of its loss (once by full restitution, once in the way of damages).

Overlooking the fact that, if past history in similar cases is any reliable indicator, the victim will be fortunate to recoup its funds even once, the appellant's point is well taken as a theoretical matter. We agree with the Eighth Circuit's resolution of precisely the same question in *United States v. Gaultier*, 727 F.2d 711, 716 (8th Cir.1984), and follow it in this case. Restitution, in the trial judge's discretion, is an altogether appropriate condition of probation when a swindler is convicted—but even the target of a heartless criminal fraud is entitled only to be made whole, not to an extra drumstick or two.

We will not belabor the point, for the government, to its credit, has conceded the matter on appeal. We hold that the matter of restitution should have been subject to a limitation. Accordingly, we direct that, upon remand, the sentence be modified to provide that any amounts recovered by or on behalf of GM in its civil suit will serve to reduce *pro tanto* Fermin's probationary obligation to make restitution.

## IV

We need go no further. For the reasons which we have stated, we find the defendant's appeal to be a flimsy construct—roughly on a par with the substantiality of his representations to Granja Mora. Fermin was lawfully indicted and fairly tried. His conviction on each and all of the six counts is unassailable. And, the district court did not err in the imposition of sentence (except with respect to the need for adding a limiting condition to its restitution order, *see supra* Part III–B). The judgment below must be, and hereby is,

*Affirmed. The case is remanded for the entry of a condition vis-a-vis restitution as herein stipulated.*