# United States Court of Appeals
## For the First Circuit

No. 16-1896

UNITED STATES OF AMERICA,

Appellee,

v.

ANDREW GORDON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Barron, Selya and Lipez,
Circuit Judges.

Robert L. Sheketoff for appellant.
Rachel Y. Hemani, Assistant United States Attorney, with whom
William D. Weinbreb, Acting United States Attorney, was on brief,
for appellee.

November 7, 2017

**SELYA**, **Circuit Judge**. After attempting unsuccessfully to hire a hit man to murder his wife (the person whom he asked to facilitate the matter tipped off the authorities and the hired gun turned out to be an undercover state trooper), defendant-appellant Andrew Gordon then sought to procure the services of a second hit man to kill both the tipster and the imposter. That attempt, too, came to naught. This time, though, federal authorities charged the defendant with five counts of using facilities of interstate commerce in connection with the hiring of a person to commit a murder. See 18 U.S.C. § 1958(a).

The defendant was tried and convicted on all counts, and the district court sentenced him to what amounted to twenty years' imprisonment. He now appeals, raising both an evidentiary issue and a question of first impression in this circuit concerning the appropriate unit of prosecution under the statute of conviction. After careful consideration, we hold that the district court did not commit reversible error with respect to the challenged evidentiary ruling and, thus, we affirm the defendant's conviction. We further hold, however, that the appropriate unit of prosecution under 18 U.S.C. § 1958(a) is a single plot to murder a single individual, not the number of times that the facilities of interstate commerce were used. Because the government charged the defendant in separate counts for separate uses of the facilities of interstate commerce without regard to the number of

- 2 -

plots or the number of intended victims, we direct that the counts be merged, vacate the defendant's sentence, and remand for resentencing.

## I. BACKGROUND

We briefly rehearse the facts and travel of the case. Because the defendant does not challenge the sufficiency of the evidence, we present the facts in a balanced manner. See United States v. Cox, 851 F.3d 113, 118 n.1 (1st Cir. 2017).

In late 2014, the defendant was being detained at the Billerica House of Corrections while awaiting trial in state court for the solicitation of his wife's attempted murder. While there, he met a fellow inmate, whom we shall call CW (an acronym for "cooperating witness"). CW had a lurid history of prior convictions for violent crimes and was himself awaiting trial on charges of aggravated rape and assault with a dangerous weapon.

The defendant asked if CW knew anyone who "had the balls to kill." CW replied that he had a cousin who would be willing to kill in exchange for money. Over the course of several ensuing conversations, the defendant disclosed that he wanted two individuals murdered: the state trooper who had posed as a hit man in the defendant's botched attempt to rid himself of his wife and the person who had reported the defendant's scheme to the authorities. These persons, if not eliminated, would likely be key witnesses for the prosecution in the defendant's forthcoming

criminal trial, and the defendant gave CW written information concerning both of them.

Lightning sometimes does strike twice, and the defendant was betrayed a second time. CW squealed and coordinated with law enforcement personnel as they recruited an undercover agent to pose as CW's cousin (the erstwhile hired gun). The government equipped its ersatz hit man with a post office box and a telephone number in New Hampshire, which were designed to serve as channels of communication with the defendant.

At that juncture, CW introduced the defendant to the undercover agent masquerading as CW's fictional cousin/hit man. During a period of nearly four months, the defendant engaged in numerous mail exchanges with the fake hit man and used intermediaries to relay messages to the hit man by telephone. In these communications, the men discussed the logistics of the planned slayings. The government gathered footage of the defendant receiving and responding to letters from the phony hit man and recordings of the defendant speaking on the telephone in connection with the plot. When the trap was sprung and the defendant was charged with violating section 1958(a) (known colloquially as the "murder-for-hire" statute), two of these mailings and three of the telephone calls comprised the building blocks for the five counts of the indictment: each count represented a discrete use of the

- 4 -

facilities of interstate commerce in furtherance of the plot to carry out the anticipated killings.

At trial, the defendant did not testify. His counsel argued, though, that the defendant had been putting on a show: he had only been pretending to need the services of CW's cousin in order to curry favor with CW. He had been afraid of CW, and this fear motivated him to feign participation in the murder-for-hire plot.

The jury proved unreceptive to this tall tale. After a week-long trial, it found the defendant guilty on each of the five counts charged in the indictment. The district court sentenced the defendant to what amounted to twenty years' imprisonment, to run concurrently with a state-court sentence for the attempted murder of his wife that he had already begun serving. This timely appeal followed.

## II. ANALYSIS

Ably represented, the defendant advances two claims of error. We start with his assertion that the district court erred in admitting impermissible character evidence. We then mull his assertion that the government employed the wrong unit of prosecution in its charging document. Finding this second claim of error to have merit, we conclude by discussing the appropriate remedy.

## A.  The Challenged Evidentiary Ruling.

The Billerica House of Corrections (where the defendant was detained) is operated under the aegis of the Middlesex County Sheriff's Department.  The defendant argues that the district court should not have allowed the following testimony from George Karelis, a Sheriff's Department employee responsible for investigations within the House of Corrections:

> Prosecutor: And in that capacity, did you become familiar with the troublemakers that were inmates at the jail?
>
> Karelis: Yes.
>
> Prosecutor: Did the name of [CW] ever cross your desk?
>
> Defense Counsel: Objection, your honor.
>
> The Court: Overruled.
>
> Karelis: As a troublemaker?
>
> Prosecutor: Yes.
>
> Karelis: No, sir.

In the defendant's view, this testimony offended Federal Rule of Evidence 404(a)(1), which generally proscribes the admission of character evidence for the purpose of showing "that on a particular occasion the person acted in accordance with the character or trait."

When claims of error are preserved, rulings admitting or excluding evidence are ordinarily reviewed for abuse of discretion.[1]  See United States v. Iwuala, 789 F.3d 1, 5 (1st Cir. 2015); United States v. Gobbi, 471 F.3d 302, 311 (1st Cir. 2006). When claims of error are not preserved, though, such rulings are reviewed only for plain error.  See United States v. Bailey, 270 F.3d 83, 87-88 (1st Cir. 2001).

We repeatedly have held, consistent with the express command of Federal Rule of Evidence 103(a)(1)(B), that "objections to evidentiary proffers must be reasonably specific in order to preserve a right to appellate review." United States v. Holmquist, 36 F.3d 154, 168 (1st Cir. 1994); see Bailey, 270 F.3d at 87-88. The defendant's bald objection could not have been less specific: no attempt was made to state the grounds for the objection.  Nor does the context suffice to rescue the objection.  Although surrounding circumstances sometimes may dress an otherwise bare objection and make the reason for the objection obvious, see Fed. R. Evid. 103(a)(1)(B), that principle does not apply where, as here, the record suggests a multitude of possible grounds for the objection.  For example, the objection could have been predicated

_____

[1] We say "ordinarily" because, if a preserved claim of error challenges the district court's interpretation of one of the Federal Rules of Evidence, de novo review may be appropriate. See United States v. Zarauskas, 814 F.3d 509, 519 (1st Cir. 2016). That does not appear to be the case here: the defendant's challenge is directed at the court's application of such a rule.

on concerns about relevancy, concerns about the form of the question, concerns about the ambiguity inherent in the term "troublemaker," concerns about the balance between probative value and unfair prejudicial effect, or concerns about something entirely different. Rule 103(a)(1)(B) is intended to shield a trial judge from the need to engage in such guesswork, see United States v. Vargas, 471 F.3d 255, 262-63 (1st Cir. 2006), and the rule should have been complied with in this instance. Consequently, we hold that the objection was not duly preserved and, thus, review is for plain error.

To prevail on plain error review, the defendant must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). The party asserting that an error was plain must carry the burden of establishing that the claimed error satisfies each element of this standard. See United States v. Bramley, 847 F.3d 1, 5 (1st Cir. 2017); United States v. Vega Molina, 407 F.3d 511, 521 (1st Cir. 2005). Since the defendant's claim so readily fails on the third element of the analysis, we need not discuss the other elements.

As we have explained, erroneously admitted evidence may be said to have affected a defendant's substantial rights only if

the admission of that evidence was likely to have influenced the outcome of the trial. See Bramley, 847 F.3d at 7; United States v. Padilla, 415 F.3d 211, 221 (1st Cir. 2005) (en banc). Here, the contested exchange is but a pebble in the avalanche of compelling evidence introduced against the defendant at trial. Although CW was an important participant in the government's evidence-gathering process, the bulk of the government's proof was captured by either video or audio recordings in which the defendant could be seen or heard engaging (independent of CW) in an active effort to arrange a pair of murders for hire with an individual represented to be a hit man. Indeed, a substantial portion of this evidence was generated while the defendant and CW were billeted in separate dormitories at the House of Corrections and not permitted to communicate with each other. It follows, we think, that even if there were a clear and obvious error in admitting the challenged testimony — a matter on which we take no view — that error was not likely either to have influenced the outcome of the trial or to have affected the defendant's substantial rights. Plain error was plainly absent.

In an effort to blunt the force of this mass of evidence, the defendant argues that he was merely pretending to enter into a scheme with CW so that the latter would befriend him. The defendant suggests that the contested exchange significantly

bolstered CW's credibility and, thus, undermined the defendant's "play-acting" line of defense.

This suggestion does not withstand scrutiny. The jurors were exposed to plenty of troubling information about CW's lurid past, yet this information did not lead them to find the defendant's fear of CW credible. The bare fact that CW's name had never been brought to Karelis's attention as a "troublemaker" seems unlikely to have impacted the jurors' assessment of the defendant's purported fear to any meaningful extent. It was, therefore, unlikely to have influenced the outcome of the trial.

That ends this aspect of the matter. Viewing the record as a whole, we deem speculative at best the defendant's claim that allowing Karelis to answer the single question to which an objection had been interposed somehow affected the defendant's substantial rights. That claim is too weak to clear the high bar imposed by plain error review. Given the powerful evidence of his guilt, the defendant has not shown a reasonable probability that, but for the admission of the challenged testimony, the outcome of the trial likely would have been different. See Jones v. United States, 527 U.S. 373, 394-95 (1999) ("Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights.").

## B.  **The Unit of Prosecution.**

Next, the defendant asseverates that the indictment used the wrong unit of prosecution and, thus, was multiplicitous. Although the district court twice rejected this asseveration, we are less sanguine.

The statute of conviction reads in relevant part:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

18 U.S.C. § 1958(a).  The government argues that the appropriate unit of prosecution is each separate use of the facilities of interstate commerce.[2]  On that basis, it charged the defendant with five distinct violations of the statute.  The defendant counters

---

[2] To be precise, section 1958(a) speaks in terms of the facilities of "interstate or foreign commerce."  Foreign commerce is not involved in this case, so we use "interstate commerce" throughout as a shorthand.

that the appropriate unit of prosecution is each plot to hire someone to commit a murder. On that basis, he argues that the indictment is multiplicitous because he should have been charged in only a single count.[3] These divergent views have real-world consequences: if only a single count was appropriate, the defendant's sentence would be limited by the ten-year statutory maximum. See id. If, however, the government were free to employ each use of the facilities of interstate commerce as the unit of prosecution, the defendant would be exposed to multiple punishments that could total substantially more than ten years.

This issue is fully preserved. The defendant raised it below both by a pretrial motion to dismiss and at the close of all the evidence. The district court rejected the defendant's importunings on both occasions and explicated its reasoning in a post-trial opinion. See United States v. Gordon, 169 F. Supp. 3d 301, 303-04 (D. Mass. 2016). Since the issue turns on a question of statutory interpretation, our review is plenary. See United States v. Marquez, 280 F.3d 19, 22 (1st Cir. 2002).

The prohibition against multiplicitous prosecution derives from the Double Jeopardy Clause. See United States v.

---

[3] While the defendant concedes that the government might have charged two counts (one for each of the two targets), he nevertheless points out that because the government opted to charge both attempted murders in each of the five counts, the indictment was multiplicitous.

Pires, 642 F.3d 1, 15 (1st Cir. 2011) (quoting Illinois v. Vitale, 447 U.S. 410, 415 (1980)); see also U.S. Const. amend. V. As relevant here, "multiplicity" means that a single crime (or "unit of prosecution") has been charged as multiple crimes, each of which is to be punished separately. See United States v. Chiaradio, 684 F.3d 265, 272 (1st Cir. 2012). We have illustrated the way in which this branch of the multiplicity doctrine works through the following example: "when a felon has violated 18 U.S.C. § 922(g) by possessing a firearm, it would be multiplicitous to charge the felon with two counts simply because he had it yesterday and today." Id.

In general terms, when "a claim of multiplicity is premised on an indictment alleging several violations of a single statutory provision, an inquiring court must determine whether there is a sufficient factual basis to treat each count as separate." United States v. Stefanidakis, 678 F.3d 96, 100-01 (1st Cir. 2012) (citing Pires, 642 F.3d at 15). Here, this determination depends on whether Congress intended to punish separately each of the alleged violations. See Jeffers v. United States, 432 U.S. 137, 155 (1977) (plurality opinion).

The problem, then, is easily defined — but less easily solved. The combination of a clumsily drafted statute, enigmatic legislative history, and sparse precedent presents a quandary. The key to unlocking that quandary is congressional intent. See

Chiaradio, 684 F.3d at 272 (explaining that, in identifying appropriate unit of prosecution, "Congress's intent is paramount").

In ascertaining congressional intent, we employ "the traditional tools of statutory construction, including a consideration of the language, structure, purpose, and history of the statute." McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 423 (1st Cir. 2007) (quoting Estey v. Comm'r, Me. Dep't of Human Servs., 21 F.3d 1198, 1201 (1st Cir. 1994)). Our starting point is the text of the statute itself. See United States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987). To the extent that Congress chose words that it did not define, we assume those words "carry their plain and ordinary meaning." Stornawaye Fin. Corp. v. Hill (In re Hill), 562 F.3d 29, 32 (1st Cir. 2009).

If a statute's plain meaning supplies a plausible interpretation, the inquiry is often at an end. See id. Here, however, the plain meaning of the words that Congress used in framing the description of the offense suggests two possible units of prosecution. Those words can be read (as the government posits) to criminalize each act of travel or each use of the facilities of interstate commerce in service of a murder-for-hire scheme. But those words also can be read (as the defendant posits) to criminalize each plot or scheme to murder an individual for which

- 14 -

something of value is promised in consideration for the solicited murder.  Since this text is sufficiently malleable to accommodate either of the proposed units of prosecution, we must undertake the judicial equivalent of an archeological dig to ascertain Congress's intent.

In some cases, Congress's will can be divined from an examination of the statute as a whole.  See Sturgeon v. Frost, 136 S. Ct. 1061, 1070 (2016).  Perlustration of the sentencing scheme embedded in section 1958(a) illuminates Congress's thinking and — at the same time — highlights the odd results that would flow from adopting the government's proposed unit of prosecution.  The statute provides for a maximum of ten years' imprisonment for a violation that does not result in personal injury, a maximum of twenty years' imprisonment for a violation that does result in personal injury, and a maximum of death or life imprisonment if murder results.  See 18 U.S.C. § 1958(a).  This taxonomy comprises a graduated sentencing scheme and, as such, conveys a clear indication of Congress's apparent belief that the greater the harm to the victim, the harsher the punishment should be for the offender.

The government's proposed unit of prosecution would frustrate this congressional aim: it would, for example, expose a person who made ten telephone calls in service of a failed plot that caused no injury to anyone to a much steeper maximum sentence

than a person who, as a result of a single telephone call, caused substantial personal injury to a victim. Such a result seems irrational when considered in light of the evident purpose of the statute's sentencing scheme. The unit of prosecution advocated by the defendant (which focuses on the number of plots) is much more consistent with the victim-centric sentencing scheme formulated by Congress.

Statutory history and legislative context furnish additional sources of insight that a court may inspect when attempting to discern congressional purpose. See Greenwood Tr. Co. v. Massachusetts, 971 F.2d 818, 824 (1st Cir. 1992). This analysis, too, supports a plot-focused unit of prosecution. Though the Senate Report explaining the adoption of section 1958 gives some comfort to both sides of this debate (it is replete with statements that may arguably support either proposed unit of prosecution), the discussion that focuses on the overlap between state and federal jurisdiction is especially instructive. At the time of enactment, murder prosecutions had "been the almost exclusive responsibility of state and local authorities." S. Rep. No. 98-225, at 304 (1984), as reprinted in 1984 U.S.C.C.A.N. 3182, 3484. The Report, though, reflected the Senate's determination that the "option of federal investigation and prosecution should be available when a murder is committed or planned as consideration for something of pecuniary value and the proper federal nexus

. . . is present."  Id. at 304-05.  The drafters nonetheless cautioned that:

> [f]ederal jurisdiction should be asserted selectively based on such factors as the type of defendants reasonably believed to be involved and the relative ability of the federal and state authorities to investigate and prosecute.  For example, the apparent involvement of organized crime figures or the lack of effective local investigation because of the interstate features of the crime could indicate that federal action was appropriate.

Id. at 305.  In pursuance of this theme, the Report makes pellucid that the crime Congress thought it was penalizing was similar to existing state murder crimes (for example, solicitation of murder) but also included certain specified features warranting federal intervention.  The focal point of the newly added offense was a murder plot that had a federal nexus, not the federal nexus itself.  The government's thesis concerning the appropriate unit of prosecution turns this rationale on its head and, in effect, makes the federal nexus the substantive offense.[4]

---

[4] The government places great emphasis on a passage in the Report, which states that the "gist of the offense is the travel in interstate commerce or the use of the facilities of interstate commerce or of the mails with the requisite intent and the offense is complete whether or not the murder is carried out or even attempted."  S. Rep. No. 98-225, at 306 (1984) as reprinted in 1984 U.S.C.C.A.N. 3182, 3484.  This passage, the government says, supports its argument that the offense was intended to punish each use of the facilities of interstate commerce.  But the government's emphasis is misplaced: the passage does not indicate whether multiple uses constitute serial violations of the statute and, thus, furnishes little guidance as to the appropriate unit of prosecution.

The history of the statute's enactment reinforces the centrality of the murder-for-hire plot.  Section 1958 became law as part of the Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, 98 Stat 1837.  It was enacted along with a companion provision, 18 U.S.C. § 1959, which criminalized violent crimes in aid of racketeering activity.  Both provisions were added as part of a congressional effort to "proscribe[] murder and other violent crimes committed for money or other valuable consideration or as an integral aspect of membership in an enterprise engaged in racketeering."  S. Rep. No. 98-225, at 304.  A unit of prosecution focused on the murder-for-hire plot seems more in keeping with this legislative history than one focused on the use of the facilities of interstate commerce.

It is an age-old tenet of statutory interpretation that "plain meaning sometimes must yield if its application would bring about results that are . . . antithetical to Congress's discernible intent."  Hill, 562 F.3d at 32; see Church of the Holy Trinity v. United States, 143 U.S. 457, 459 (1892).  Extrapolating from this tenet, it follows logically that when the plain meaning of a statute can feasibly suggest two results — one which appears consistent with Congress's intent and the other not — the consistent result should carry the day.  This is such an instance. Although both interpretations offered here may seem plausible at a glance, closer examination reveals that the government's

- 18 -

interpretation is suspect because it is "antithetical to Congress's discernible intent" as made manifest by the statute's graduated sentencing scheme and its legislative history. <u>Hill</u>, 562 F.3d at 32.

As we already have explained, under the government's theory, a person who makes ten telephone calls to a hit man in service of a failed murder-for-hire plot commits ten separate crimes; yet a person who unsuccessfully makes arrangements to procure the murder of ten individuals in a single uninterrupted telephone call commits but one crime. The first of these malefactors would, therefore, be subject to ten times the maximum punishment to which the second malefactor would be exposed. Given the congressional objectives we have identified, we think it obvious that Congress could not have intended the statute to operate in so curious a fashion.

In reaching the conclusion that the correct unit of prosecution is plot-centric, we echo the only other published circuit court decision squarely on point. The Sixth Circuit so held in <u>United States</u> v. <u>Wynn</u>, 987 F.2d 354, 359 (6th Cir. 1993), ruling that the appropriate unit of prosecution under section 1958(a) is the number of plots to murder a single victim.[5] In

---

[5] To be sure, there is an unpublished Sixth Circuit opinion that takes a different view. <u>See</u> <u>United States</u> v. <u>Ng</u>, 26 F. App'x 452 (6th Cir. 2001) (per curiam). That opinion, however, is bereft

_Wynn_, as in this case, the government had argued that each telephone call made by the defendant in support of his scheme "was a separate offense." _Id._ at 358-59. The court rejected this argument, explaining that "separate phone calls which relate to one plan to murder one individual constitute only one violation of 18 U.S.C. § 1958." _Id._ at 359.

We add, moreover, that the case law that interprets other aspects of section 1958(a) is somewhat inhospitable to a unit of prosecution that penalizes each use of interstate facilities. For instance, in _United States_ v. _Edelman_, 873 F.2d 791 (5th Cir. 1989), the Fifth Circuit held that, for a defendant to violate section 1958(a), he need neither intend nor be aware that any facility of interstate commerce would be used in connection with the murder-for-hire plot. _See id._ at 794-95. It is enough if the government can show, say, that "the mails were in fact used in the commission of [the] offense" and that the defendant "had knowledge of the nature of the substantive offense which he promoted." _Id._

Given the holding in _Edelman_, incorporating the government's proposed unit of prosecution into existing doctrine would yield a regime in which a defendant could be charged with a separate count each time a hit man he had hired opted (unbeknownst to the defendant) to make a telephone call, send an e-mail, or

_____

of precedential value even in the circuit that spawned it. _See_ 6th Cir. R. 32.1(b).

- 20 -

post a letter.  See id.  Such an arbitrary relationship between a defendant's conduct and the maximum penalty to which he is exposed offers scant redemption for the government's view.[6]

Heedless of these authorities, the government invites us to read the statute woodenly.  We decline the invitation.  When faced with a wooden reading of a statute that would produce a result that conflicts with the clear congressional purpose animating that statute, a reviewing court ought to be open to adopting a textually plausible alternative reading that would produce a more sensible result.  See Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 40 (1st Cir. 2000).

We do not gainsay that identifying the proper unit of prosecution under section 1958(a) presents a challenging question.  There are two sides to the story, and the government has done its level best to marshal arguments in support of its position.  On the surface, its most persuasive argument is that the Travel Act, 18 U.S.C. § 1952 (which penalizes each act of travel or use of the mail or other facility of interstate commerce), was the model for section 1958(a), so that the unit of prosecution for section 1958(a) should match that of the Travel Act.  See 18 U.S.C. § 1952;

---

[6] Adopting the government's suggested unit of prosecution would be particularly problematic in cases, like this one, in which the government uses an undercover agent who, by controlling contact with a defendant, can easily manipulate the number of chargeable counts.  Here, for example, the government could, on its theory, have elected to charge the defendant with many more counts.

- 21 -

see also S. Rep. No. 98-225, at 305. With a little probing, however, this comparison crumbles. The government's attempted analogy ignores salient differences between the anatomy of the Travel Act and the anatomy of the murder-for-hire statute. The two are more like cousins than they are like twins. We explain briefly.

Like the counterpart language in section 1958(a), a conviction under the Travel Act requires that a defendant "travel[] in interstate or foreign commerce or use[] the mail or any facility in interstate or foreign commerce, with intent to" engage in a prohibited activity. 18 U.S.C. § 1952. To complete an offense under the Travel Act, though, the defendant must also "thereafter perform[] or attempt[] to perform" a prohibited activity. Id. In contrast, section 1958(a) includes no requirement of an act subsequent to the use of interstate facilities in order to complete the offense. This missing element — the requirement of a subsequent act — makes it surpassingly difficult to believe that Congress intended for the units of prosecution under these two laws to be the same. In the end, we conclude that the government is comparing plums to pomegranates.

The government also points to cases distinguishing between statutes that criminalize the means of committing a substantive offense and those that criminalize the offense itself. See, e.g., United States v. Lilly, 983 F.2d 300, 304 (1st Cir.

- 22 -

1992).  Specifically, courts have found that the mail and wire fraud statutes, see 18 U.S.C. §§ 1341, 1343, are in the former category, criminalizing each use of the facilities of interstate commerce in the service of a crime. The government argues — without meaningful analysis — that the murder-for-hire statute should be interpreted in the same way.  For several reasons, though, any similarity between the murder-for-hire statute and the mail and wire fraud statutes proves too little.

To begin, while references to the facilities of interstate commerce are ubiquitous in our nation's laws, the significance of such language necessarily varies based on context. Some statutes, such as the Securities Act, 15 U.S.C. § 77q(a), feature the familiar "interstate commerce" language, yet have units of prosecution that are distinct from those embodied in the mail and wire fraud statutes.  See United States v. Waldman, 579 F.2d 649, 654 (1st Cir. 1978) (establishing appropriate unit of prosecution for securities fraud under section 77q(a) as each "separate transaction[] accompanied by use of the mails").  Thus, the simple attempt to compare section 1958(a) to other statutes invoking the channels of interstate commerce brings us no closer to an answer than when we began.  Further mining is required to ascertain whether a particular statute criminalizes the means of committing a substantive offense or the offense itself.

Such an excavation is revealing with respect to the mail and wire fraud statutes. From a textual perspective, neither of those statutes contains strong indicators that Congress intended the unit of prosecution to be something other than each use of the relevant facilities of interstate commerce. Indeed, the description of a "scheme or artifice to defraud" is ensconced in those statutes by parenthetical commas and followed by a discussion of the relevant facilities of interstate commerce. 18 U.S.C. §§ 1341, 1343. Thus, the grammatical structure of the statute suggests the supremacy of the "means" element — the use of the mails or wires — and the correspondingly subordinate nature of the "substantive offense" element — the scheme or artifice to defraud. The murder-for-hire statute does not share this architecture. Moreover, the murder-for-hire statute contains a graduated sentencing scheme that readily elucidates a congressional focus on potential harm to victims.

So, too, legislative history offers a principled basis for distinguishing the mail and wire fraud statutes from the murder-for-hire statute, notwithstanding the shared allusion to interstate commerce. The progenitor to the current mail fraud statute was enacted in 1872 as "part of a 327-section omnibus act chiefly intended to revise and recodify the various laws relating to the post office." Jed S. Rakoff, The Federal Mail Fraud Statute (Part I), 18 Duq. L. Rev. 771, 779 (1980) (citation omitted). At

the time, Congress was concerned about misuse of the national postal system, a federal entity that — due to a quickly developing national economy and a suddenly muscular federal government — had an expanded role during the Reconstruction Era. See id. at 779-80. To safeguard the integrity of the postal system, punishment under the federal mail fraud statute "was to be based not so much on the degree of the fraud as on the degree of misuse of the mails." Id. at 784. The wire fraud statute, enacted in 1952, was deliberately "patterned on the mail fraud" statute. United States v. Fermin Castillo, 829 F.2d 1194, 1198 (1st Cir. 1987) (citing S. Rep. No. 82-44, at 14 (1951)). Except for the means employed, the "requisite elements" of the mail and wire fraud statutes "are identical."[7] Id.

We believe that this legislative history convincingly demonstrates that, in enacting the mail and wire fraud statutes, Congress took aim at the means of conducting a substantive offense, not at the substantive offense itself. That is not true of the murder-for-hire statute: rather, in fashioning section 1958(a), Congress quite plainly chose the latter target.

To say more would be to paint the lily. Where a statute can be read in two ways, both of which are literally feasible but only one of which is plausible, common sense dictates that the

---

[7] Of course, the "requisite elements" of the murder-for-hire statute are materially different.

plausible reading ought to prevail.  In this case, the text, structure, history, and purpose of section 1958(a), taken together and considered in light of the case law, lead us to hold that the proper unit of prosecution under the murder-for-hire statute is a single plot to murder a single individual.  Under this statute, Congress did not intend to punish separately each use of the facilities of interstate commerce.  It follows inexorably that the indictment is multiplicitous and that the defendant is entitled to relief.

### C.  The Remedy.

This brings us to the nature of the relief to which the defendant is entitled.  As we have explained, the five counts of conviction are premised on an incorrect unit of prosecution.  Those counts, therefore, are multiplicitous.  Nor is the error that resulted in the proliferation of counts harmless: the statute of conviction carries a ten-year maximum term of immurement for a thwarted murder for hire.  See 18 U.S.C. § 1958(a).  Because of the multiplicitous character of the indictment (that is, the presence of multiple counts), the district court was able to engage in "stacking," see USSG §5G1.2(d), and to impose what amounts to a twenty-year term of immurement.

Viewed against this backdrop, the multiplicity error requires that we vacate the defendant's sentence.  It also requires that we direct the district court, on remand, to merge the five

counts into a single count and resentence the defendant.[8]  We take no view either of the sentence to be imposed on the merged count or of how that sentence should interface with the state sentence that the defendant is currently serving, except to note that the merged count will be subject to the statutory maximum sentence adumbrated in 18 U.S.C. § 1958(a).

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we affirm the defendant's conviction but vacate his sentence.  We remand the case to the district court with directions to merge the five counts of conviction into a single count and to resentence the defendant consistent with this opinion.

**Affirmed in part, Vacated in part, and Remanded.**

---

[8] The government argues that, even if we conclude (as we have) that the correct unit of prosecution is plot-centric, two counts should survive (one for each of the two intended victims).  We do not agree.  After all, the government charged the proposed killing of both victims in each of the five counts and, in so doing, denied the jury the opportunity to make independent findings with respect to the possible existence of more than one murder-for-hire plot. See supra note 3.  That duality distinguishes this case from United States v. Vasco, 564 F.3d 12, 17, 24 n.9 (1st Cir. 2009), upon which the government mistakenly relies.